[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11237
_____

D.C. Docket No. 0:15-cv-61706-UU

VIRIDIS CORPORATION,
a Nevada corporation,
BECK-FORD CONSTRUCTION, LLC,
a Texas corporation, et al.,

                                        Plaintiffs-Appellants,

versus

TCA GLOBAL CREDIT MASTER FUND, LP,
a Grand Cayman corporation,
ROBERT D. PRESS, individually, et al.

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 3, 2018)

Before WILSON and ROSENBAUM, Circuit Judges, and ROBRENO,[*] District Judge.

ROBRENO, District Judge:

Viridis Corporation ("Viridis"), Beck-Ford Construction, LLC ("Beckford"), LCTI Low Carbon Technologies International, Inc. ("LCTI"), Ideal National Mechanical Corporation ("Ideal"), Commercial & Institutional Mechanical, Ltd. ("C&I"), Sustainable Energy Properties, Inc. ("SEP"), WK Management Services, Inc. ("WKMS"), and Bryan Scott Jarnagin (collectively "Appellants" or "Borrowers"), appeal the order of the United States District Court for the Southern District of Florida dismissing in its entirety their Third Amended Complaint ("TAC") for failure to state claims upon which relief may be granted. TCA Global Credit Master Fund, LP ("Global"), TCA Fund Management Group ("Fund Management Group"), TCA Global Credit Fund Group, Ltd, Inc. ("Credit Fund Group"), Robert Press, and Donna Silverman (collectively "Appellees") were named as defendants in the TAC, which alleged statutory claims under RICO and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and common law claims for usury, misrepresentation, conspiracy, and breach of contract. The claims all arose from high interest rate financing agreements pursuant to which Appellants borrowed significant funds. We have jurisdiction pursuant to 28 U.S.C.

---

[*] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

§ 1291.  Because we conclude that the district court's dismissal order was too broadly drawn, we affirm in part and reverse in part.

## I.

The history of the parties' commercial loan transactions is complex and lengthy.[1]  The parties entered into a First Credit Agreement ("FCA") in November 2013 providing a credit facility[2] in the amount of $10 million secured by a first prior security interest in the Borrowers' collateral.[3]  The FCA contained a "lockbox" provision requiring the Borrowers' receivables to be accumulated in a designated account to be used to repay the loan.  It also contained a release provision purporting to release any and all claims relating to or arising out of any of the loan documents executed by the parties and a waiver provision stating that each Borrower waived every present and future defense or claim against the lenders.

Unhappy with Global's failure to advance loan proceeds even though the value of the collateral exceeded the amount of the credit facility, in February 2014 Appellants requested that Global allow them to obtain financing from another lender.  Global refused the request, and Appellants were unable to complete a

---

[1] The facts, accepted as true, are taken from the TAC.
[2] A "credit facility" refers to a line of credit provided in increments with each incremental loan released according to agreed-upon conditions.
[3] Only four of the Appellants were parties to the FCA:  LCTA, C&I, SEP, and WKMS.

3

planned acquisition deal. At this same time, Global allegedly violated the lockbox agreement, impaired Appellants' cash flow, and left them without sufficient funds to pay their debts and finance their operations. In May 2014, the parties executed a First Amendment to the FCA to provide Appellants with additional working capital. This agreement also included release and waiver provisions.

Again unhappy with Global for withholding lockbox funds, Appellants sought refinancing of the debt from another lender in the summer of 2014. They secured a term sheet for a $6 million revolving credit line to repay the outstanding amount owed under the FCA and to cancel Global's first-priority security interest in the Borrowers' collateral. Global allegedly refused to cooperate with the new lender's due diligence efforts. In September 2014, Global issued a default letter to the Borrowers and represented to the new lender that the Borrowers had failed to comply with their obligations concerning the lockbox account and their reporting duties. Because of the default letter, the new lender refused to close the new loan. Appellants allege that one month before it issued the default letter, Global had unilaterally closed the lockbox account — making it impossible for the Borrowers to direct customer deposits to that account — and did not provide them with timely information about a replacement lockbox account established at a different bank.

Notwithstanding these difficulties, Global proposed that the Appellants accept financing in the form of a $500,000 credit advance from Global to acquire

4

Beckford.    Global allegedly required that a new borrower entity, Viridis, be incorporated in Nevada to consummate the Beckford acquisition.  This resulted in the parties' execution of a Second Amendment to the FCA and a Second Replacement Revolving Note on October 24, 2014 in the amount of $3.77 million, representing the unpaid principal and interest and other fees due under the FCA, plus the new advance.  The Second Amendment also contained release and waiver provisions.

In December 2014, Global's counsel prepared documents for a replacement credit facility of $4.1 million under a Second Credit Agreement ("SCA").  This was despite the fact that the $500,000 advance evidenced by the Second Amendment and the anticipated advance of $4.1 million in additional financing under the SCA would have been within the amount of credit facility already provided by the FCA.  Global insisted on the new credit agreement.  Shortly before closing, Appellant Jarnagin, the principal behind the corporate entity borrowers, was presented with numerous documents including a personal guaranty and a requirement that the borrowers under the FCA accept liability for the performance of the obligations of the borrowers under the SCA and the related loan documents. The SCA was executed on December 31, 2014.  As a part of the documents contained in the SCA, Viridis, Beckford, and Jarnagin agreed to the following release provision:

14.20 Release.  In consideration of the mutual promises and covenants made herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, **each Credit Party hereby agrees to fully, finally and forever release** and forever discharge and covenant not to sue **the Lender Indemnitees**, and each one of them, **from any and all** debts, fees, attorneys' fees, liens, costs, expenses, **damages**, sums of money, accounts, bonds, bills, covenants, promises, judgments, charges, demands, **claims, causes of action, Proceedings, suits**, liabilities, expenses, **obligations or contracts of any kind whatsoever**, whether in law or in equity, whether asserted or unasserted, whether known or unknown, fixed or contingent, under statute or otherwise, **from the beginning of time through the Effective Date, including any and all claims relating to or arising out of any financing transactions**, credit facilities, notes, debentures, security agreements, and other agreements, **including each of the Loan Documents, entered into by the Credit Parties with Lender** and any and all claims that the Credit Parties do not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect their decision to enter into this Agreement or the related Loan Documents.  The provisions of this Section shall survive the satisfaction and payment of the other Obligations and the termination of this Agreement.

SCA ¶ 14.20 (emphasis added).[4]  Additionally, as part of the SCA, Appellants LCTI, C&I, SEP, WKMS, and Ideal executed a Repayment Agreement containing the same release provision, and the following waiver clause:

11.4 <u>WAIVER OF DEFENSES</u>.  THE CREDIT PARTIES WAIVE EVERY PRESENT AND FUTURE DEFENSE, CAUSE OF

---

[4] The release provision contained in the earlier credit facility documents, while containing a similarly extensive list of the types of things released, included slightly different language.  The FCA release, which is materially identical to the releases included in both amendments to it, provided that each Borrower "expressly agrees that the foregoing release and waiver agreement is intended to be as broad and inclusive as permitted by the laws governing the Credit Agreement."  It further provided that, "[i]n addition to, and without limiting the generality of foregoing, each of the Borrowers further covenants with and warrants unto the Lender and each of the other Lender Indemnitees, that as of the date hereof, there exists no claims. . . ."

ACTION, COUNTERCLAIM OR SETOFF WHICH THE CREDIT PARTIES MAY HAVE AS OF THE DATE HEREOF TO ANY ACTION BY LENDER IN ENFORCING THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. THE CREDIT PARTIES WAIVE ANY IMPLIED COVENANT OF GOOD FAITH AND RATIFIES AND CONFIRMS [sic] WHATEVER LENDER MAY DO PURSUANT TO THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AS OF THE DATE OF THIS AGREEMENT.    THIS    PROVISION    IS    A    MATERIAL INDUCEMENT FOR LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO BORROWER.

Repayment Agreement § 11.4 (capitalization and underlining in original).

All proceeds from the SCA, minus the fees deducted by Global, were used by Jarnagin and his Nevada entity Viridis to acquire Beckford.  As a result of the closing, Global obtained a first-priority lien on the Borrowers' and Beckford's assets.  Global's first-lien position, together with the guarantees from Jarnagin, allegedly diminished Appellants' ability to obtain financing from any other lender because Global would need to give its express consent.

By February 2015, Global began withholding amounts due to Beckford and Ideal from the lockbox without explanation or notice.  In March 2015, when Jarnagin asked about their alleged misuse of the lockbox, Global began to ask for accelerated payments of the principal, despite Jarnagin's request for an extension of the maturity date in accordance with the terms of the SCA.  Appellees Silverman and Press, Global's highest-ranking executives, sent an e-mail to Jarnagin, stating that they would cause Global to issue default notices, after which

they would appoint bankers to take control of the businesses if Jarnagin continued to question or object to their use of the lockbox or Global's request for increased payments. In a March 2015 e-mail, Press renewed the threats he made earlier, advising Jarnagin that the Borrowers must do what Global demanded because, as he told Jarnagin at an earlier meeting, "[t]his is not a discussion of equals" and Global "is [as] serious as a tumor."

Between 2014 and 2015, Jarnagin continued to seek refinancing from another lender. In April 2015, Jarnagin requested Silverman provide a payoff amount for the SCA in connection with a commitment letter received from a Texas lender. Under the SCA, the Borrowers had the right to pay off the outstanding balance without penalty, as of April 1, 2015. Immediately following Jarnagin's request for the payoff statement, Silverman informed Jarnagin of an alleged default. Also in April 2015, Silverman informed Jarnagin that Press had directed that Global was prohibited from reinstating the SCA to a non-default status unless Jarnagin signed an audit statement. Jarnagin refused to sign the audit statement because there was no default and because the statement was materially false. Global then issued a formal notice of default dated May 1, 2015, alleging that a failure to pay under the Repayment Agreement triggered the cross-default and cross-collateralization provisions of both the SCA and the Repayment Agreement.

8

This notice of default caused the discussions with the other lender to break off. Thereafter, Global continued to make collection demands.

The suit was filed on August 14, 2015. The TAC, the fourth iteration of Appellants' complaint, was filed on March 31, 2016, and asserted the following claims: (1) Breach and Bad Faith under the FCA against Global; (2) Fraudulent Misrepresentation against all Defendants; (3) Breach and Bad Faith under the SCA on behalf of Beckford, LCTA, and WKMS against Global; (4) Fraudulent Misrepresentation against all Defendants; (5) Tortious Interference against all Defendants; (6) Damages for Florida Usury Law Violations against Global; (7) Declaratory Relief for Florida Usury Law Violations against Global; (8) Violation of the FDUTPA against all Defendants; (9) Damages from Civil Conspiracy against all Defendants; (10) Violation of RICO under 18 U.S.C. § 1962(c) against Press, Silverman, Global, Credit Fund Group, and Fund Management Group; and (11) Violation of RICO 18 U.S.C. § 1962(d) against Press, Silverman, Credit Fund Group, and Fund Management Group.

The district court granted Appellees' motion to dismiss all claims in the TAC, holding that "it is clear that Plaintiffs effectively waived and released Defendants from any and all claims that arose prior to the execution of each agreement." [ECF No. 171 at 30 (footnote omitted)]. The only claim not covered by the release — because it pertained to Appellees' conduct subsequent to the

9

signing of the final agreement — was the claim in Count Three for Breach of Contract and Bad Faith under the SCA.  However, the district court found that Count Three failed to state a plausible claim.  [*Id.*]  Accordingly, the entire TAC was dismissed.

## II.

We review *de novo* a dismissal for failure to state a claim.  *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 870 F.3d 1262, 1270 (11th Cir. 2017) (citing *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns., Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004)).  "We must reverse the dismissal if the complaint 'state[s] a claim to relief that is plausible on its face,' *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), after we accept the factual allegations as true and draw all reasonable inferences in favor of the claimant. . . ."  *Id.* (citing *Spanish Broad. Sys.*, 376 F.3d at 1070).

## III.

Appellants argue that the district court erred in finding that, save for Count Three, the release and waiver provisions extinguished all of their claims.  They assert that (1) the releases in the SCA and the Repayment Agreement "were not broad enough to cover" their claims related to the FCA; and (2) since all of the release provisions were premised upon Global's performance of its material

promises and covenants in the Credit Agreements and Global breached its material obligations as lender, none of the claims were barred by the releases.[5] We agree with the district court that the release and waiver provisions in the SCA extinguished Appellants' claims pertaining to events that occurred before the parties executed the SCA, including the claims in Count One alleging a breach of the FCA and Count Five alleging tortious interference with Appellants' efforts to refinance the FCA.[6]

Appellants first argue that unlike the release in the FCA, the releases in the SCA and the Repayment Agreement were too narrow to preclude all of the claims they are raising here. They assert that the release in the SCA was materially different from the release in the FCA because the SCA release referred to a different agreement, a different set of parties, and different loan documents. They also contend the SCA release was not as broad. For example, they note that the releases in the SCA and the Repayment Agreement use the phrase "including" to introduce a description of the claims extinguished, but the release in the FCA uses the broader phrase, "including, without limiting the generality of the foregoing."

---

[5] Although Appellants discuss the releases and waivers in the FCA and the Amendments thereto asserting that those provisions cannot bar their claims, we do not need to address these arguments since the district court did not rely upon those provisions. [ECF 171 at 34-35; *see also id.* at 32 ("this Court need not delve into the clauses in all of the agreements since the Second Credit Agreement, as well as the related Repayment Agreement, contains provisions pursuant to which Plaintiffs purport to waive and release and any and all claims and damages of the type asserted in the Third Amended Complaint.").]

[6] We address claims for events happening after the SCA was executed in Section V below.

They contend that the releases in the SCA and Repayment Agreement, according to their plain meaning, did not cover the claims related to the FCA.  We conclude that the district court did not err in finding that there were no material distinctions between the releases in the two sets of agreements and that the release in the SCA barred in their entirety Count One's claim for breach of the FCA and Count Five's claim for tortious interference.

The SCA's use of the word "including" comes after a list of exactly what was being released — "causes of action, Proceedings, suits, liabilities, expenses, obligations or contracts of any kind whatsoever . . . whether known or unknown" — and comes before examples of things intended to be on the list, specifically, "any and all claims relating to or arising out of any financing transactions . . . including each of the Loan Documents."  The FCA contained a similar list of exactly what was being released:  "any and all . . . promises, judgments, charges, demands, claims, causes of action, suits, Proceedings, liabilities, expenses, obligations or contracts of any kind whatsoever. . . ."  The "including, without limiting the generality of the foregoing" clause likewise stated examples of things on this list, "including without limitation, each of the Loan Documents, entered into by any Borrower with Lender and any and all claims that any Borrower does not know or suspect to exist. . . ."  The scope of these several releases is equally broad.  More importantly, the list of examples in each Agreement specifies the

12

very things upon which Appellants sued, i.e., the Loan Documents they were signing.  Appellants cite no authority to support their assertion that the minor difference in wording creates a material difference in the construction of the clauses, nor do they state any cogent argument that the difference in wording changes the fact that by agreeing to the SCA they released the very claims upon which they sued.[7]  Moreover, their argument that the releases in the SCA and Repayment Agreement "according to their plain meaning, did not cover the claims related to the First Credit Agreement" is also meritless since the releases unambiguously specify that they cover all "causes of action . . . obligations or contracts of any kind whatsoever . . . whether known or unknown . . . from the beginning of time through the Effective Date . . . ."  Appellants' assertion that the SCA release does not reach accrued claims related to the FCA would unreasonably restrict the meaning of the provision.  *See Premier Ins. Co. v. Adams*, 632 So. 2d 1054, 1057 (Fla. Dist. Ct. App. 1994) ("an interpretation which gives a reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable" (citing *First Nat'l Bank v. Savannah, F. & W. Ry. Co.*, 18 So. 345 (Fla. 1895)); *Mohr Park Manor, Inc. v. Mohr*, 424 P.2d 101, 111 (Nev. 1967) ("[A] contract should be construed, if logically and legally permissible, so as

---

[7] Whether the "Credit Parties" listed in the FCA and SCA differed is also immaterial since every individual or entity named as a plaintiff in the TAC was a signatory to the SCA or the Repayment Agreement and is bound by the release provisions thereof.

13

to effectuate valid contractual relations, rather than in a manner which would render the agreement invalid, or render performance impossible); Restatement (Second) of Contracts, § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").

Appellants also argue that the district court erred in holding that their claims were released because it "failed to take into account that all of the releases were premised upon the mutual promises and covenants in the Credit Agreements," which "were consideration for the releases." This argument misstates the district court's holding. It was not ruling on "all of the releases." It relied only on the release in the SCA, which it found released any claim that accrued before that agreement was executed. To the extent that Appellants argue that the SCA release fails for lack of consideration because of Appellees' subsequent alleged breach, this too is incorrect. In the SCA, Appellants released any accrued claim in exchange for the financing the released parties provided. The only claim that the SCA was breached, Count Three, does not allege that the released parties failed to provide the financing; the only claim of breach concerns their post-execution misuse of the lockbox, TAC ¶¶ 204-211, and their refusal to permit the Borrowers to arrange an early payoff. *Id.* ¶¶ 212-214. These allegations do not negate the fact that Appellants received the financing provided for in the Agreement and have

14

not sought to rescind the Agreement and repay the amount borrowed.  Thus, they cannot claim a lack of valuable consideration for the release.

### IV.

Appellants next assert that the district court erred in dismissing with prejudice the usury claims in Counts Six and Seven based on the releases.  They argue that while each agreement ostensibly contained a Nevada choice-of-law provision, (1) Florida's usury law was applicable to the credit agreements since the TAC alleges that there was no "normal relation" between the parties' transactions and the state of  Nevada, *see Cont'l Mortg. Investors v. Sailboat Key, Inc.*, 395 So. 2d 507, 513 (Fla. 1981) (where usury case involves a conflicts question, Florida courts looks to see if a normal relation exists between the transaction and the foreign jurisdiction),[8] (2) the Nevada choice-of-law clauses were inserted by Global into the agreements, and (3) under Florida law, usury claims cannot be released or waived in loan documents.  We find that the district court did not err in dismissing the usury claims regardless of which state's law applies.

The Agreements all provide that Nevada law controls their interpretation.  A district court sitting in diversity applies the choice-of-law rules of the state in which it sits, in this case Florida.  *Rando v. Gov't Employees Ins. Co.*, 556 F.3d

---

[8] While Viridis is incorporated under the laws of Nevada, Appellants nonetheless argue that there is no normal relation to Nevada because the state of incorporation was dictated by Global for the purpose of justifying the importation of Nevada's law solely to take advantage of its lack of a usury statute.

15

1173, 1176 (11th Cir. 2009).     Under Florida law, contractual choice-of-law provisions are presumptively enforceable.[9]  *Default Proof Credit Card Sys., Inc. v. Friedland*, 992 So. 2d 442, 444 (Fla. Dist. Ct. App. 2008).  However, a party may overcome this presumption by showing that a provision contravenes the strong public policy of Florida or is unjust or unreasonable.  *Id.*  "The term 'strong public policy' means that the public policy must be sufficiently important that it outweighs the policy protecting freedom of contract.   Thus, routine policy considerations are insufficient to invalidate choice-of-law provisions in a contract." *Walls v. Quick & Reilly, Inc.*, 824 So. 2d 1016, 1018-19 (Fla. Dist. Ct. App. 2002) (citing *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours and Co.*, 761 So. 2d 306, 312 (Fla. 2000)).  Appellants argue that applying Nevada law, which places no limit upon the rate of interest that may legally be charged, would violate a strong public policy in Florida against usury.  We cannot agree.

Florida has a civil usury statute that defines usury as charging more than 18 percent interest annually on a loan of $500,000 or less.  Fla. Stat. § 687.02(1). Where, as here, the amount financed exceeds $500,000, the civil statute does not apply, but usury is also made a crime in Florida.  *See id.* § 687.071.  It is a misdemeanor of the second degree to charge between 25 percent and 45 percent

---

[9] Under Florida law, a court also "makes a separate choice of law determination with respect to each particular issue under consideration." *Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115 (11th Cir. 1996) (citing *Dep't of Corr. v. McGhee*, 653 So. 2d 1091, 1092-93 (Fla. Dist. Ct. App. 1995), aff'd, 666 So. 2d 140 (Fla. 1996); *Colhoun v. Greyhound Lines, Inc.*, 265 So. 2d 18, 21 (Fla. 1972)).

interest per annum, and a third degree felony to charge higher than 45 percent interest per annum. *Id.* § 687.071(1)(g)(2), (3). Even though usury is a crime, the Florida courts have held that usury may be waived in a civil case. *Gunn Plumbing, Inc. v. Dania Bank*, 252 So. 2d 1, 4 (Fla. 1971) (citing *Yaffee v. Int'l Co., Inc.*, 80 So. 2d 910 (Fla. 1955)).

In *Gunn Plumbing*, after the borrowers had failed to repay a loan and the defendant bank brought suit, the borrowers raised as an affirmative defense that the rate of interest on the debt was usurious. Thereafter, the parties entered into a stipulation agreement to refinance the loan that also provided that the borrowers "hereby Withdraw the several defenses which they have raised in their answer and such defendants do hereby Irrevocably admit each and every allegation in the plaintiff's complaint." *Id.* at 2. The loan again fell into arrears, and the bank again initiated suit. The borrowers again raised an affirmative defense of usury.

The Florida Supreme Court held that the stipulation waiving the affirmative defense of usury was enforceable in the second lawsuit:

> This Court has followed the general rule that usury is purely a personal defense created by statute for the protection of borrowers and, therefore, any borrower may waive his right to claim the benefit of such statute. . . . A stipulation properly entered into and relating to a matter upon which it is appropriate to stipulate is binding upon the parties and upon the Court. . . . The usury statute in this State does not have the effect of invalidating contracts for interest at a rate higher than the statutory maximum, but only accords to the obligor the privilege of setting up, or waiving, affirmative defenses of usury in respect to such contracts.

17

*Id.* at 4 (citation and paragraph break omitted).

Because usury is waivable under Florida law and does not invalidate an otherwise binding contract, Appellants cannot show that deterring usury is a "strong public policy."  Without such a showing, there is no cause to disregard the parties' choice of Nevada law to control their agreement irrespective of whether there is "normal relation" between the parties' transactions and Nevada.  Further, even if we were to conclude otherwise, Appellants' claims would fare no better since the claims were validly released under Florida law.[10]  Accordingly, the district court did not err in determining that the two usury-based claims, Counts Six and Seven, were implausible because they were released.

## V.

Appellants next argue that, like the claim in Count Three that the district court excluded from the reach of the release because it involved conduct occurring

---

[10]  We also conclude that that there is no conflict between Nevada law and Florida law governing the efficacy of the releases with regard to the usury claims since the law of both states is essentially the same.  Under Nevada law, "release terms are only enforceable against claims contemplated at the time of the signing of the release and do not apply to future causes of action unless expressly contracted for by the parties."  *Clark v. Columbia/HCA Info. Servs., Inc*, 25 P.3d 215, 223-24 (Nev. 2001).  A release term, like all contract terms, will be enforced as written where the term "is clear on its face."  *Canfora v. Coast Hotels & Casinos, Inc.*, 121 P.3d 599, 603 (Nev. 2005).  Similarly in Florida, a release "will ordinarily be regarded as embracing all claims or demands which had matured at the time of its execution."  *Hold v. Manzini*, 736 So. 2d 138, 141 (Fla. Dist. Ct. App. 1999) (quotation omitted).  Clear and unambiguous release provisions are enforceable.  *Brewer v. Laborfinders of Tampa*, 944 So. 2d 1102, 1103 (Fla. Dist. Ct. App. 2006); *Plumpton v. Cont'l Acreage Dev. Co., Inc.*, 830 So. 2d 208, 210 (Fla. Dist. Ct. App. 2002) ("'Where the language of the release is clear and unambiguous, we cannot indulge in construction or interpretation of its plain meaning.'" (quoting *Hury v. Leatherby Ins. Co.*, 380 So. 2d 432, 433 (Fla. 1980))).

18

after the release was executed, Count Two's common law claim for fraudulent misrepresentation, Count Four's common law claim for fraudulent misrepresentation, Count Eight's claim for violation of the FDUTPA, Count Nine's claim for civil conspiracy, and the two RICO claims in Counts Ten and Eleven also involved misconduct after the SCA was executed and should not have been dismissed.  We conclude that most of this argument is not supported by the allegations in the TAC; however, there are portions of some of the non-contract claims that allege tortious conduct occurring after the execution of the release in the SCA, and the district court improperly included those claims within the ambit of the release and waiver without distinguishing when they accrued.[11]  We also agree with Appellants that Counts Two and Four were improperly dismissed.

---

[11] As noted above, courts are to undertake a separate choice-of-law analysis for each claim.  While we remand certain claims and portions of claims that allege conduct occurring after the execution of the release in the SCA, unless otherwise specified we express no opinion with regard to which state's law applies to those claims.  We note only that our cases hold that a choice-of-law provision that by its terms governs only the parties' contractual relationship may not provide the choice-of-law for non-contract claims.  *See Green Leaf Nursery v. E.I. Dupont de Nemours & Co.*, 341 F.3d 1292, 1300-01 (11th Cir. 2003) (finding that a choice-of-law provision that stated "this release shall be governed and construed in accordance with the laws of the State of Delaware" "calls for the application of the selected law to determine only the scope and effect of the release" and not any related tort claims (citing, *inter alia*, *Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.*, 133 F.3d 1405, 1409-10 (11th Cir. 1998)).  If the choice-of-law provision of the agreement is narrow, it only governs claims relating to the contract.  *See Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009) ("A choice of law provision that relates only to the agreement will not encompass related tort claims.").  In *Green Leaf Nursery*, we distinguished more broad choice-of-law provisions such as those that refer "to any and all claims or disputes arising out of" an agreement.  *Id.* at 1300.  It is for the district court to decide in the first instance where the choice-of-law clause in the SCA falls on that spectrum.

19

A.

Count Two's common law claim for fraudulent misrepresentation is based on alleged misrepresentations made prior to the execution of the FCA, namely that Appellees were ready, willing and able to provide the $10 million in financing and would timely transfer excess funds in the lockbox to the Borrowers. *TAC* ¶ 193. Count Four's common law claim for fraudulent misrepresentation is based on alleged misrepresentations made prior to the execution of the SCA, namely that Appellees would timely transfer loan proceeds and would permit a twelve month repayment of amounts due under the SCA. *TAC* ¶¶ 115-16, 217-24. The district court held that this conduct was also covered by the release and waiver in the SAC. [ECF 110 at 31 n.2] However, the district court overlooked the fact that both Florida and Nevada prohibit a contractual waiver that exculpates a contracting party's fraudulent misconduct. *See Oceanic Villas, Inc. v. Godson*, 4 So. 2d 689, 690-91 (Fla. 1941) (holding that a contract provision cannot preclude a fraud claim unless the contract expressly states that it is incontestable on the ground of fraud);[12] *Burton v. Linotype Co.*, 556 So. 2d 1126, 1127 (Fla. Dist. Ct. App. 1989) ("'Fraud is an intentional tort and thus not subject to the cathartic effect of the

---

[12] We recently observed that the Florida Supreme Court has not overruled *Oceanic Villas*, explicitly or implicitly, and the Florida intermediate courts of appeal have continued it apply it to contractual waivers of intentional misconduct. *Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1027 (11th Cir. 2017) (citing cases).

exculpatory clauses found in contracts.'" (quoting *L. Luria & Son, Inc. v. Honeywell, Inc.*, 460 So. 2d 521, 523 (Fla. Dist. Ct. App. 1984))); *Lawyers Title of Nev., Inc. v. Bonar*, 381 P.3d 633 (table), 2012 WL 1923697, at *2 (Nev. May 23, 2012) (holding that an exculpatory clause was ineffective to immunize liability for a knowing misrepresentation) (citing Restatement (Second) of Contracts § 195(1) (1981) ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.")).  While the release and waiver provisions in the SCA are broad in the extreme, they do not state that they are incontestable on the ground of fraud.  Accordingly, we find the district court erred in determining that the common law fraud claims in Counts Two and Four were implausible on the strength of the release.

## B.

Count Eight asserts as deceptive acts or unfair practices (1) charging of fees for "advisory" services that allegedly were not provided, (2) charging usurious interest in the FCA, (3) misrepresentations regarding the lockbox created under the FCA, and (4) falsely threatening to issue notices of default.  *TAC* ¶¶ 262-65.  The only substantive references to fees for "advisory" services contained in the TAC refer to fees collected at the execution of the First Amendment to the FCA, *id.* ¶ 85.  Thus, these fees fall within the reach of the release.  The lockbox and usury

21

misrepresentation allegations also fall within the release since the allegations limit the claim to the lockbox created and the interest charged under the FCA.

However, the false threats of default mentioned in Count Eight are not as narrow. The alleged threats to declare defaults occurred both before and after execution of the release in the SCA. While the allegations of such threats contained in paragraphs 84, 93-99 and 111 of the TAC refer to defaults of the FCA and Second Amendment to the FCA, the allegations contained in paragraphs 136-47 clearly relate to threats to issue default notices of the SCA in order to prevent the Borrowers from seeking refinancing of the outstanding debt owed under that Agreement. Thus, Count Eight, to the extent it alleges deceptive conduct in Appellees' threats to issue default notices under the SCA in order to prevent the Borrowers from seeking refinancing of the outstanding debt owed under that Agreement, cannot fall within the release and waiver contained in the SCA since it is post-execution conduct. The Borrowers only released claims existing "from the beginning of time through the Effective Date," and only waived claims "WHICH THE CREDIT PARTIES MAY HAVE AS OF THE DATE HEREOF." Similarly, since the alleged conspiracy in Count Nine was to commit the acts listed in Counts Two, Four, Five, Six and Eight, *see id.* ¶ 267, Count Nine's claim of conspiracy to commit post-release conduct is also not subject to the release and waiver. Because

this aspect of Counts Eight and Nine is not rendered implausible for the reasons stated by the district court, it was error to dismiss them with prejudice.[13]

## C.

The RICO claims in Counts Ten and Eleven allege two types of racketeering activity: collecting unlawful/usurious debts and wire fraud. Because they are based on the usury allegation contained in Count Six, we conclude that the district court did not err when it dismissed the RICO usury allegations in Counts Ten and Eleven since under the pleadings, it is implausible that Appellees were using racketeering activity to commit usury.

The RICO wire fraud claims in Counts Ten and Eleven are based in part on allegations that (1) Appellees induced the Borrowers to execute the FCA and related Loan Documents through the use of false statements in emails and telephone calls; and (2) prior to the execution of the SCA, Appellant Silverman (a) represented to Jarnagin in a telephone call that Global would timely transfer

---

[13] We note that Count Eight specifies that it is brought pursuant to Florida's unfair trade practices law. To establish a FDUTPA claim, a plaintiff must prove three elements: (i) a deceptive act or unfair practice; (ii) causation; and (iii) actual damages. *Hetrick v. Ideal Image Dev. Corp.*, 758 F. Supp. 2d 1220, 1229 (M.D. Fla. 2010); *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007). To establish a claim under the analogous Nevada unfair trade practices statute, Nev. Rev. Stat. § 41.600(1), a plaintiff must prove that (1) an act of consumer fraud (defined in § 41.600(2)(e) to include a "deceptive trade practice") by the defendant (2) caused (3) damage to the plaintiff. *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009). We leave it to the district court to decide in the first instance whether the remaining post-release-execution claims should be controlled by the SCA's choice-of-law provision and, if it determines that Nevada law controls the claim, whether leave to amend should be freely granted in the district court's discretion under Rule 15(a)(2) to allege the analogous Nevada claim.

lockbox proceeds, and (b) committed wire fraud to prevent Appellants from being able to refinance the outstanding balance of the FCA. *TAC* ¶¶ 35-36, 92, 114-15, 283, 285. We find that these allegations are within the reach of the release in the SCA.

However, other RICO wire fraud allegations refer to post-release-execution racketeering acts. Specifically, the two RICO claims incorporate facts asserting wire fraud was committed to prevent Appellants from refinancing the SCA. *Id.* ¶ 285. These wire fraud allegations occurred after the release was executed and are not, accordingly, within its reach. We reverse the district court's dismissal order to the extent that it reached this portion of the RICO counts.

## VI.

Finally, Appellants argue that Count Three's claim for breach and bad faith under the SCA stated a plausible claim, and it was error to dismiss it with prejudice. In so dismissing it, the district court held that, while the claim was brought in the name of Beckford, LCTI, and WKMS, there were no allegations that Global breached an obligation to LCTI and WKMS under the terms of the SCA.[14] [ECF 171 at 41.] Rather, the TAC alleged that the SCA required Global to make

---

[14] Appellants do not appear to raise any specific argument regarding the dismissal of the claim of LCTI and WKMS.

24

payment each week of the Net Amount[15] due and owed to Beckford under the second lockbox agreement and to provide an accounting for the lockbox, and Global failed to do so in accordance with the terms of the agreement. [*Id.*] With regard to Beckford's claim in Count Three, the district court held that the allegation of breach was implausible since (1) the terms of the agreement gave Global the "sole and absolute" discretion to transfer monies out of the lockbox to Beckford, and (2) Beckford failed to plead that it was entitled to the Net Amount from the lockbox. [*Id.* at 41-42.] The court noted that Section 2(2.1)(e)(i)(4)(ii) of the SCA provided that Beckford would receive the Net Amount only if (1) six conditions precedent are met, (2) Beckford remains in good standing, and (3) no Event of Default had occurred under any loan document. However, the district court found Beckford failed to allege that it complied with the conditions precedent such that it should be entitled to the Net Amount. [*Id.* 42-43.]

Under both Nevada and Florida law, every contract contains an implied covenant of good faith that requires that parties conform to the standards of good faith and fair dealing in order to protect reasonable contractual expectations. *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 862 P.2d 1207, 1209 (Nev. 1993); *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th

---

[15] The agreements define "Net Amount" as "[t]he amount remaining in the Lock Box Account following the payment of the Lock Box Payments on each Payment Date (less any amount in the Lock Box Account withheld and applied by Lender to the Reserve Amount) . . . ."

25

Cir. 2005) (applying Florida law).  Under Florida law, a breach of this covenant, however, does not create an independent cause of action.  *Centurion*, 420 F.3d at 1151.  Only when a breach of an express term of the contract is pled can a claim for breach of the implied covenant of good faith and fair dealing be maintained.  *Id.* at 1152; *Snow v. Ruden, McCloskey, Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 792 (Fla. Dist. Ct. App. 2005) ("There can be no cause of action for a breach of the implied covenant "absent an allegation that an express term of the contract has been breached."); *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1439 (S.D. Fla. 1996) (claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached); *Burger King Corp. v. Holder*, 844 F. Supp. 1528, 1530 (S.D. Fla. 1993) (same).  Also, applying Florida law, we have held that "an implied duty of good faith cannot be used to vary the terms of an express contract."  *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999) (citing *City of Riviera Beach v. John's Towing*, 691 So. 2d 519, 521 (Fla. Dist. Ct. App. 1997)).  The *Weaver* court went on to state,

> the Florida courts have refused to allow a cause of action for breach of the implied covenant of good faith and fair dealing under two circumstances.  First, where the party alleged to have breached the implied covenant has in good faith performed all of the express contractual provisions.  [] Second, where the implied duty of good faith alleged to have been breached would vary the express terms of the contract.  [] Under Florida law, therefore, the implied covenant of good faith and fair dealing confers limited rights.  As this court has

26

previously stated, "the 'covenant' is not an independent contract term. It is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms de facto when performance is maintained de jure."

*Id.* at 1316-17 (quoting *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414 (11th Cir. 1990) (applying Georgia law) (other citations omitted).

Nevada law, however, treats this type of claim differently. In *Hilton Hotels v. Butch Lewis Prods.*, 808 P.2d 919, 922 (Nev. 1991), the Nevada Supreme Court stated that a plaintiff "may still be able to recover damages for breach of the implied covenant of good faith and fair dealing" even though there was no actual breach of the agreement. Later, in *Morris v. Bank of Am. Nev.*, 886 P.2d 454 (Nev. 1994), the Court stated that "[w]here one party to a contract deliberately countervenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing." *Id.* at 457 (citation and internal quotation marks omitted).

We conclude that the district court erred in its consideration of Count Three with regard to Beckford's bad faith claim when it dismissed the claim under Florida law without determining which state's law applied to the claim. Under the SCA's choice-of-law provision, the law of Nevada governed the contract. Since Nevada permits an independent claim for breach of the duty of good faith and fair dealing there appears to be no need to prove an actual breach under Nevada law. On remand, the district court should address this apparent conflict, conduct a

27

choice-of-law analysis, and determine whether the allegations in the TAC state a plausible claim for breach of the SCA and breach of the duty of good faith and fair dealing.

VII.

For the reasons stated in full above, the district court's order is affirmed or reversed as follows:

1.    The dismissal of Count One's claim for breach of the First Credit Agreement (misuse of the lockbox, bad faith in approving requests for advances, refusal to permit a payoff) is **AFFIRMED** since all alleged conduct is covered by the release in the Second Credit Agreement.  The dismissal of Count Five's claim for tortious interference (with the third party lender commitment to provide financing to pay off the First Credit Agreement), Count Six's claim for damages for violation of Florida Usury Law (interest rates charged under all agreements), and Count Seven's claim for declaratory relief under Florida's Usury Law is **AFFIRMED** for the same reason.

2.    The dismissal of Count Two's claim for fraudulent misrepresentation and Count Four's claim for fraudulent misrepresentation is **REVERSED** because the release and waiver do not state that they are incontestable on the ground of fraud.

3.    The dismissal of Count Three's claim for breach of the Second Credit Agreement (misuse of the lockbox, refusal to permit a payoff) is **REVERSED**

28

because the district court failed to conduct a choice-of-law analysis before applying Florida law to the claim.

4.    The dismissal of Count Eight's claim for violation of the Florida Deceptive and Unfair Trade Practices Act (charging fees for services that were not performed, charging usurious interest, misrepresentations regarding the lockbox, falsely threatening to issue default notices) is **AFFIRMED IN PART AND REVERSED IN PART**.  The order of dismissal is reversed to the extent the claim is based on conduct allegedly occurring after the execution date of the Second Credit Agreement (threats to issue default notices of the Second Credit Agreement in order to prevent borrowers from refinancing; misuse of lockbox) and affirmed in all other respects.

5.    The dismissal of Count Nine's claim for damages from civil conspiracy (conspiracy to commit the act described in Counts Two, Four, Five, Six, and Eight) is **AFFIRMED IN PART AND REVERSED IN PART**.  The order of dismissal is reversed to the extent the claim is based upon an alleged conspiracy to commit (1) the conduct described in Counts Two and Four and (2) the conduct in Count Eight that is alleged to have occurred after the execution date of the Second Credit Agreement and affirmed in all other respects.

6.    The dismissal of Count Ten's claim for violation of RICO (collecting unlawful/usurious debts, wire fraud committed to prevent refinancing of the

Second Credit Agreement) and Count Eleven's claim of RICO conspiracy is

**AFFIRMED IN PART AND REVERSED IN PART**.  The order of dismissal is

reversed to the extent the RICO claims are based on the wire fraud allegations and

affirmed with regard to usury allegations.[16]

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[16] Because we reverse a portion of the district court's decision on the federal RICO claims, we do not reach Appellants' argument that the district court should have declined to exercise supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(c).